aIN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

STUART M. MAPLES, Trustee for          )
PRICEVILLE PARTNERS, LLC.,             )
                                       )
    Plaintiff,                         )
                                       )
    v.                                 )          **Case Nos. 5:18-CV-01035-KOB**
                                       )                    **5:18-CV-01036-KOB**
JOHN KLEIN, et al.,                    )                    **5:18-CV-01037-KOB**
                                       )
    Defendants.                        )          **This Document Relates to All Cases**


## <u>MEMORANDUM OPINION</u>

    Priceville Partners, LLC, a used car dealership and title-pawn lending service, voluntarily filed for Chapter 11 bankruptcy on March 4, 2016. The bankruptcy trustee sued Priceville's former owners, asserting various claims of fraudulent transfers, preferential payments, and breach of duties—in short, nefarious misdealings and mismanagement of Priceville's assets.

    Plaintiff, bankruptcy trustee Stuart Maples, originally filed three separate cases in the United States Bankruptcy Court for the Northern District of Alabama against Priceville's former owners, John Klein, Harold Jeffreys, and Ben Jeffreys, on February 17, 2018. The three Defendants withdrew reference from the bankruptcy court to this court on July 2, 2018 (Doc. 1)[1], and the court consolidated the three cases on October 9, 2018. (Doc. 9.) Defendants jointly filed the instant motion for summary judgment on August 22, 2019 (Doc 25), to which Mr. Maples

---

[1] Unless otherwise specified, docket numbers refer to Case 5:18-cv-01035-KOB, which is Mr. Maples's suit against John Klein. References to "H. Jeffreys Doc" and "B. Jeffreys Doc" refer to docket entries in Mr. Maples's suits against Harold Jeffreys (Case 5:18-cv-01036-KOB) and Ben Jeffreys (Case 5:18-cv-01037-KOB), respectively. "Bankr. Doc" refers to docket entries in the bankruptcy case pursuant to Priceville's voluntary filing of a Chapter 11 petition on March 4, 2016. (Bankr. Case No. 16-80675-CRJ11.)

responded (Doc. 27) and Defendants replied. (Doc. 35.) For the reasons detailed below, the court will GRANT in part and DENY in part Defendants' motion for summary judgment.

## I.    Background

In 2013, Harold Jeffreys and Ben Jeffreys, along with Greg Steenson, formed Priceville Partners as a used-car dealership and title-pawn lending service. (Doc. 7-6 at 2.) Originally, Ben Jeffreys owned a 20 percent interest in Priceville, and Harold Jeffreys and Mr. Steenson owned 40 percent each, but Harold Jeffreys soon acquired Ben Jeffreys's interest, giving Harold Jeffreys a 60 percent interest. In 2014, John Klein, Ben Jeffreys, Harold Jeffreys, Mr. Steenson, and Katie Klein (who is John Klein's wife, Harold Jeffreys's daughter, and Ben Jeffreys's sister), organized Priceville Partners II. (*Id.* at 2–3.)

Mr. Maples alleges that Mr. Steenson "was the onsite manager of the Debtor," and Defendants engaged with Priceville's business "on a regular basis." (H. Jeffreys Doc. 21 at 3.) Mr. Maples states that Harold Jeffreys held weekly meetings and repaired vehicles (*id.*); Ben Jeffreys worked with vehicles, "signed bills of sale," and "made most of the bank deposits" for Priceville (B. Jeffreys Doc. 5 at 2); and John Klein managed Priceville II and attended monthly meetings with other Priceville owners (Doc. 7-6 at 3).

On December 21, 2015, Harold Jeffreys sued Mr. Steenson in Alabama state court for several claims related to Mr. Steenson's alleged fraud and breach of fiduciary duty as co-owner and operator of Priceville. (Doc. 25-2.) Harold Jeffreys also sued Joseph Wynn, Priceville's accountant. Harold Jeffreys and Mr. Steenson settled the case for $3 million sometime between November 22, 2017 and January 18, 2018, *Jeffreys v. Steenson,* No. 52-cv-2015-900580 (Doc. 180), and pursuant to a joint stipulation of dismissal, the state court dismissed the suit against Mr. Wynn on March 13, 2019. *Jeffreys v. Wynn*, No 52-cv-2016-900266 (Doc. 191).

On March 4, 2016, Priceville voluntarily filed for Chapter 11 bankruptcy. (Bankr. Doc. 1.) In February 2017, Mr. Maples assumed trusteeship for Priceville. (Bankr. Docs. 290–91.) A year later, on February 17, 2018, Mr. Maples brought three separate actions against Ben Jeffreys, Harold Jeffreys, and John and Katie Klein in the United States Bankruptcy Court for the Northern District of Alabama. (Bankr. Docs. 446–448.) Mr. Maples later amended two of the three complaints. (Doc. 7-6; H. Jeffreys Doc. 21.) Defendants moved to withdraw the case to this court on July 2, 2018 (Doc. 1); the court granted the motion on September 11, 2018 (Doc. 3) and consolidated the three cases on October 9, 2018. (Doc. 9.)

In July of 2019, the parties filed joint stipulations of dismissal for several claims against Ben Jeffreys and John Klein and all claims against Katie Klein. (Doc. 20; B. Jeffreys Doc. 19.) The court dismissed the specified claims against John Klein and Ben Jeffreys and dismissed Katie Klein from the case with prejudice. (Doc. 37.)

After the dust settled, Mr. Maples, as the debtor's trustee, brings a total of eight causes of action that partially overlap among three Defendants. Mr. Maples's remaining claims are as follows: his federal claims against John Klein are (1) fraudulent transfers and (2) preferential payments; and his state law claims are (3) fraudulent transfers and (4) alter ego. His federal claims against Ben Jeffreys are (1) fraudulent transfers and (2) preferential payments; and his state law claim is (3) fraudulent transfers. Mr. Maples's federal claims against Harold Jeffreys are (1) fraudulent transfers, (2) preferential payments, (3) equitable subordination, and (4) post-petition transactions; and his state law claims are (5) fraudulent transfers, (6) breach of good faith and fair dealing, and (7) breach of loyalty and care.

To support his claims, Mr. Maples's complaints paint a generally unflattering picture of Priceville's operation and management. He alleges that Harold Jeffreys, a sophisticated

businessman who personally invested more than $3 million into Priceville, knew that Mr.

Steenson was a convicted felon, but that Harold Jeffreys partnered with Mr. Steenson anyway to

help run the used-car business. (H. Jeffreys Doc. 21 at 3.) He further alleges that Harold

Jeffreys's "gross mismanagement" and negligence permitted Mr. Steenson to turn the business

into a "scam." (*Id.* at 5.)

The complaints also allege that all three Defendants used vehicles paid for by Priceville

or used Priceville accounts to pay for personal items. (Doc. 7-6 at 3; B. Jeffreys Doc. 5 at 4–5.)

Mr. Maples included with his complaints a list of 19 checks from Priceville to John Klein

between 2014 and early 2016, as well as a list of debit payments from Priceville II that went

toward a variety of organizations, mostly gas stations and restaurants. (Doc. 7-6 at 11–19.) Mr.

Maples argues that Harold Jeffreys gave friends and family members preferential loan rates for

Priceville's vehicles and that, after Priceville filed for bankruptcy, Harold Jeffreys transferred

title of at least ten Priceville-owned vehicles to a salvage shop. (H. Jeffreys Doc. 21 at 6.) Mr.

Maples further asserts that John Klein fraudulently transferred about $135,000 of Priceville's

assets to himself and family members (Doc. 7-6 at 7); Ben Jeffreys fraudulently transferred about

$200,000 to himself and family members (B. Jeffreys Doc. 5 at 9); and Harold Jeffreys

fraudulently transferred about $700,000 to himself and family members and is liable for a total of

almost $2.5 million. (H. Jeffreys Doc. 21 at 12.)

Lastly, Mr. Maples alleges that Ben Jeffreys, along with other employees of Priceville,

manipulated Priceville's books to falsely show that certain businesses owed Priceville money

that, in fact, was not owed. (B. Jeffreys Doc. 5 at 3). Mr. Maples now seeks to recover

Defendants' allegedly fraudulent transfers and hold Defendants accountable for their putative

self-serving behavior as Priceville's owners and managers.

## II.     Standard

Summary judgment allows a trial court to decide cases when no genuine issues of material fact are present and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56. When a district court reviews a motion for summary judgment, it must determine two things: (1) whether any genuine issues of material fact exist; and if not, (2) whether the moving party is entitled to judgment as a matter of law. *Id.*

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56).

Once the moving party meets its burden of showing the district court that no genuine issues of material fact exist, the burden then shifts to the non-moving party "to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). In response, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material fact." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-moving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a *genuine issue for trial*.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)) (emphasis added).

The court must "view the evidence presented through the prism of the substantive evidentiary burden," to determine whether the nonmoving party presented sufficient evidence on which a jury could reasonably find for the nonmoving party to defeat the motion. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986). The court must refrain from weighing the

evidence and making credibility determinations, because these decisions fall to the province of the jury. *Id.* at 255.

Furthermore, all evidence and inferences drawn from the underlying facts must be viewed in the light most favorable to the non-moving party. *See Graham v. State Farm Mut. Ins.*, 193 F.3d 1274, 1282 (11th Cir. 1999). After both parties have addressed the motion for summary judgment, the court must grant the motion only if no genuine issues of material fact exist and if the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56.

## III. Analysis

Defendants' joint motion asks the court to grant summary judgment regarding all claims because Mr. Maples failed to either allege or demonstrate facts to support the required elements for each claim. (Docs. 25, 25-1.) Mr. Maples filed a response brief to Defendants' motion (Doc. 27), to which Defendants replied. (Doc. 35.) The court addresses each of the parties' arguments below.

### a. Preferential Payments (all Defendants)

Mr. Maples alleges that all three Defendants "unlawfully transferred inventory, cash and other interests" to either themselves, insiders, or both, within one year prior to Priceville's filing for bankruptcy, in violation of 11 U.S.C. § 547. (Doc. 7-6 at 6; H. Jeffreys Doc. 21 at 8; B. Jeffreys Doc. 5 at 6.) Mr. Maples also alleges that Harold Jeffreys advanced approximately $230,000 in preferential loans to himself. (H. Jeffreys Doc. 21 at 6.) Section 547 "allows a trustee to 'avoid'—that is, undo—certain pre-bankruptcy transfers." *Kaye v. Blue Bell Creameries, Inc.*, 899 F.3d 1178, 1197 (11th Cir. 2018).

The statute defines an avoidable preferential payment as

any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
(3) made while the debtor was insolvent;
(4) made—
    (A) on or within 90 days before the date of the filing of the petition; or
    (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
(5) that enables such creditor to receive more than such creditor would receive if—
    (A) the case were a case under chapter 7 of this title;
    (B) the transfer had not been made; and
    (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b).

Although "the trustee has the burden of proving the avoidability of a transfer under subsection (b)," 11 U.S.C. § 547(g), Defendants in this case contest only one of the elements of preferential payments: that Priceville was insolvent, pursuant to subsection (3).[2] (Doc. 25-1 at 13–14.) Chapter 11 defines insolvency as "the sum of [an] entity's debts [being] greater than all of such entity's property, at fair valuation." 11 U.S.C. § 101(32)(A).

When determining insolvency under § 547(b), a "debtor is presumed to be insolvent during the 90 days prior to its filing for bankruptcy." *Laddin v. Edwards*, No. 1:02-CV-3327, 2006 U.S. Dist. LEXIS 30356, at *19 (N.D. Ga. Apr. 20, 2006) (citing 11 U.S.C. § 547(f)). But "[n]o presumption exists outside the 90-day window." *Littleton v. Hinton*, Nos. 07-13734, 08-1027, 2009 Bankr. LEXIS 397, at *10 (Bankr. S.D. Ala. Feb. 2, 2009). For transfers conducted within the 90-day window, a defendant may rebut the presumption of insolvency by presenting evidence demonstrating solvency. *See Willson v. MLA, Inc.*, 153 B.R. 1002, 1017 n.13 (Bankr.

---

[2] Although Defendants only contest the element of insolvency for this count, they also raise the statutory defense of "added value," pursuant to 11 U.S.C. § 547(c)(4), which holds that a trustee may not avoid a transfer if the creditor gives "new value" to the debtor. (Doc. 25-1 at 22–23.) Because, as explained below, Mr. Maples cannot facially establish all the elements of the cause of action, the court need not address the added-value defense.

N.D. Ga. 1993) (holding that the statute "merely raises a presumption of insolvency which may be rebutted by contrary evidence.")

Priceville filed a voluntary bankruptcy petition on March 4, 2016. (Doc. 7 at 1.) For a presumption of insolvency to apply, Mr. Maples must offer evidence to demonstrate that a potentially avoidable transfer occurred in the 90-day window between December 5, 2015 and March 4, 2016. Although Mr. Maples's brief does not specifically cite to any transfer that occurred during this time frame, the court located in one of Mr. Maples's attached exhibits what appears to be one cash withdrawal and three checks derived from a Priceville account during mid-December of 2015. (Doc. 27-6 at 40.) So a rebuttable presumption of insolvency applies to these four transfers.

The attached exhibits also appear to show dozens of transfers that occurred between 90 days and one year before Priceville filed for bankruptcy. No presumption of insolvency arises regarding transfers that occur during this nine-month window, but a trustee can nonetheless raise a genuine issue of material fact regarding insolvency in any number of ways. *See, e.g., Littleton*, 2009 Bankr. LEXIS 397, at *11 (holding that repeated incidents of bounced checks or a debtor's regular borrowing of funds to avoid bounced checks create a genuine issue of material fact regarding insolvency); *Gordon v. Sec. Essentials, Inc.*, 570 B.R. 897, 909 (Bankr. M.D. Ga. 2017) (applying a "flexible, totality-of-the-circumstances test to determine whether a debtor was generally paying its debts as they came due," and considering expert financial testimony regarding solvency) (internal citation omitted).

Several courts have held that expert testimony is the usual, but not exclusive, means of determining insolvency. *See, e.g.*, *Killips v. Schropp*, 380 B.R. 529, 535 (B.A.P. 8th Cir. 2007) ("The plaintiff, in order to establish insolvency, must generally produce expert testimony"); *In re*

*Gulf Northern Transport, Inc.*, 323 B.R. 786, 790 (Bankr. M.D. Fla. 2005) ("whenever possible a determination of insolvency should be based upon expert testimony"); *SE Prop. Holdings, LLC v. Center*, No. 15-0033-WS-C, 2017 U.S. Dist. LEXIS 7224, at *8 n.5 (S.D. Ala. Jan. 19, 2017) (citing eight cases from around the country for the proposition that expert testimony is the standard means to show insolvency).

In this case, Mr. Maples cites to no evidence in his brief—from an expert or otherwise—that raises a genuine issue of material fact regarding solvency. In his discovery disclosures, Mr. Maples initially sought to employ the expert services of certified public accountant Paul Lindgren to potentially demonstrate Priceville's insolvency. (Doc. 15.) But because Mr. Maples violated Federal Rule of Civil Procedure 26(a)(2)(B) by failing to include a written report along with the initial disclosure, the court granted Defendants' motion to strike Mr. Maples's expert witness disclosure. (Doc. 17.) (The court further notes that Mr. Lindgren apparently never actually compiled any report to present to the court.) (*Id.* at 1.)

Without expert—or any—evidence, Mr. Maples's argument that Priceville was insolvent rests solely on the presumption of insolvency pertaining to four transactions and naked allegations; his brief simply refers to two complaints in related state cases (*Jeffreys v. Steenson,* No. 52-cv-2015-900580) and *Jeffreys v. Wynn*, No 52-cv-2016-900266), in which Harold Jeffreys *alleges* that Mr. Steenson and an accountant hired by Priceville defrauded Priceville out of millions of dollars. (Doc. 27 at 17–19.) Based only on Harold Jeffreys's allegations in these two complaints, Mr. Maples concludes that "[it] stands to reason that an entity that is looted by a scam, leaving precious little to pay investor creditors and other creditors, creates a jury question on its solvency. It simply does not take an expert to reach such a conclusion." (Doc. 27 at 19.)

But "allegations are not evidence," and "parties cannot rely on the pleadings filed by other plaintiffs in other cases" to create genuine issues of material fact. *Wright v. Farouk Sys.*, 701 F.3d 907, 911 n.8 (11th Cir. 2012).

Defendants, meanwhile, present the expert report of certified public accountant J. Wray Pearce, who asserts that no evidence exists that Priceville was insolvent when it transferred interests or assets to any of the three Defendants. (Doc. 25-5 at 15, 19, 21, 22.) The court finds that this uncontroverted evidence rebuts any presumption of insolvency regarding the four transfers that apparently occurred during the 90-day pre-petition window (Doc. 27-6 at 40) (*See Willson,* 153 B.R. at 1017) and supports a finding of Priceville's solvency regarding all transfers that occurred between three months and a year before Priceville filed for bankruptcy. *See Laddin*, 2006 U.S. Dist. LEXIS 30356, at *19.

Because Mr. Maples has presented no evidence to contradict the Defendants' evidence showing that Priceville was not insolvent, Mr. Maples has not raised a genuine issue of material fact to support his preferential payments claim. The court will GRANT Defendants' motion for summary judgment regarding his federal preferential payments claims. (Count III against John Klein; Count II against Harold Jeffreys; Count II against Ben Jeffreys.)

**b. Fraudulent Transfers (all Defendants)**

Both Ala. Code § 8-9A (Alabama Uniform Fraudulent Transfer Act, or "AUFTA") and 11 U.S.C. § 548(a)(1) were designed with the same goal in mind: "to protect creditors against the depletion of a bankrupt's estate." *In re Rodriguez*, 895 F.2d 725, 727 (11th Cir. 1990). To that end, both statutes allow trustees to recover (1) transfers made with actual intent to defraud creditors and (2) constructively fraudulent transfers. *PSN Liquidating Tr. v. Intelsat Corp.*, 615 F. App'x 925, 927 (11th Cir. 2015) (citation omitted). In this case, Mr. Maples alleges that all

three Defendants engaged in actual fraud under AUFTA and both actual and constructive fraud under 11 U.S.C. § 548. The court addresses both types of alleged fraud below.

### Actual Fraud under 11 U.S.C. § 548(a)(1)(A) and AUFTA

Mr. Maples alleges that all three Defendants engaged in actual fraud pursuant to both 11 U.S.C. § 548(a)(1)(A) and Ala. Code § 8-9A-4(a). Courts evaluating either statute[3] apply the same 11-factor test to determine whether a defendant engaged in actual fraud, defined as a debtor's attempt to "hinder, delay, or defraud" a creditor. 11 U.S.C. § 548(a)(1)(A); *In re Vista Bella, Inc.*, 511 B.R. 163, 194 (Bankr. S.D. Ala. 2014.)

A court applying the appropriate test asks whether (1) the transfer was to an insider; (2) the debtor retained possession or control of the property transferred after the transfer; (3) the transfer was disclosed or concealed; (4) before the transfer was made the debtor had been sued or threatened with suit; (5) the transfer was of substantially all the debtor's assets; (6) the debtor absconded; (7) the debtor removed or concealed assets; (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred; (9) the debtor was insolvent or became insolvent shortly after the transfer was made; (10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor. *In Re Xyz Options*, 154 F.3d 1262, 1272 (11th Cir. 1998).

---

[3] Defendants argue that one distinction exists between the two statutes in that AUFTA, unlike the federal statute, specifies that the allegedly fraudulent transfer must be made by the actual debtor—not merely one in control of the debtor's assets. *See* Doc. 25-1 at 25 (citing to *S.J. Holding Co. v. Kadco, Inc.*, 874 So. 2d 1036, 1042–43 (Ala. 2003)). Pursuant to this distinction, the Defendants argue in the alternative that because they are third parties to Priceville (which is the actual debtor) and are not debtors themselves, then Ala. Code § 8-9A-4(a) does not apply. But because Mr. Maples failed to provide sufficient evidence for—or even allege—that the required badges of fraud exist in this case, the court need not address Defendants' alternative argument.

These eleven factors, known as "badges of fraud," provide the framework within which courts consider circumstantial evidence to determine whether a defendant actually intended to hinder, delay, or defraud a creditor. *In re Kudzu Marine, Inc.*, 569 B.R. 192, 206 (Bankr. S.D. Ala. 2017); *see also In Re Xyz Options*, 154 F.3d at 1271 (explaining that the "badges" approach is necessary "[b]ecause proof of actual intent to hinder, delay, or defraud creditors, pursuant to 11 U.S.C. § 548 [and Ala. Code § 8-9A-4(a)], may rarely be accomplished by direct proof.") The trustee must demonstrate the defendant's actual intent to defraud by a preponderance of the evidence. *In re Vista Bella, Inc.*, at 192. But "[n]o specific combination of badges is necessary for a finding of actual intent[,] and the presence of any of the badges of fraud does not compel such a finding. The badges merely highlight circumstances that suggest that a transfer was made with fraudulent intent." *Id.* at 194–95.

In this case, Mr. Maples offers significant evidence regarding the first badge—that Defendants were insiders. An insider is defined, among other things, as "a person in control of the debtor" or a "relative of a . . . person in control of the debtor," 11 U.S.C. § 101(31)(B), and Plaintiff has provided evidence demonstrating that all three Defendants exercised control over Priceville. (Doc. 27 at 8–14, 16–17.) Furthermore, Harold Jeffreys was a managing member of Priceville (Doc. 27-3 at 20); Ben Jeffreys is Harold Jeffreys's son; and John Klein is Harold Jeffreys's son-in-law. Mr. Maples has satisfied the first badge.

But beyond the first badge, Mr. Maples offers scant evidence in his brief about the other ten badges. The brief provides a statement of "Additional Facts"—mostly coming from the deposition of Mr. Steenson—that describes Defendants' possible negligence through poor record-keeping and lack of oversight. (Doc. 27 at 11–15.) But aside from Mr. Steenson's testimony that Defendants used company credit cards to purchase personal items or used items

owned by Priceville (*id.* at 12), Mr. Maples cites to very little evidence pertaining to any badges of fraud. Instead, Mr. Maples baldly asserts that the Defendants "received favors and benefits above and beyond those available to other investors," and that these alleged benefits demonstrate Defendants' intent to defraud. (Doc. 27 at 19.) But mere allegations of wrongdoing—without specific evidence to demonstrate the presence of badges of fraud—does not create a genuine issue of material fact that Defendants actually intended to defraud anyone.

The court notes that the enormous number of documents that Mr. Maples provided to the court does not compensate for the lack of specific evidence appearing or referenced in his brief. Regarding actual fraud, Mr. Maples's brief vaguely and generally refers to three exhibits— totaling several hundred pages—and argues that "it is fair to infer that payments to the Defendants were not made in the ordinary course of business."[4] (Doc. 27 at 19.) In the early stages of this case, Mr. Maples sent the court a four-foot stack of physical courtesy-copy exhibits and other documents. But despite all this apparent evidence, his *brief* references hardly anything within the voluminous pile of papers to suggest that Defendants actually intended to hinder, delay or defraud. The court further notes that nowhere in his brief does Mr. Maples (or Defendants in their two briefs, for that matter) specifically mention by name, much less argue, that any of the eleven badges of fraud exist in this case.

The court has no burden to parse through Mr. Maples's thousands of pages of exhibits looking for a reason to deny Defendants' motion for summary judgment; that burden rests squarely on his shoulders. *See Fisher v. Ciba Specialty Chems. Corp.*, 238 F.R.D. 273, 299 n.57

---

[4] Incidentally, whether a transfer occurs in the ordinary course of business is not a relevant consideration for actual fraud purposes because such transfers do not relate to badges of fraud, pursuant to *In Re Xyz Options*, 154 F.3d 1262 (11th Cir. 1998). Whether a transfer occurs in the ordinary course of business does, however, apply to analyses of *constructive* fraud, as explained below.

(S.D. Ala. 2006) ("[T]he court is under no duty to exercise imagination and conjure what a plaintiff might have alleged, but did not, and do counsel's work for him or her. . . . [T]he onus is upon the parties to formulate arguments.") (internal citations omitted). In opposing summary judgment, the plaintiff bears the responsibility "to point to the specific portions of the proffered material which create a material issue of fact," and the court is not required to "search the record" for an unidentified issue of material fact to support a claim. *Restigouche, Inc. v. Town of Jupiter*, 59 F.3d 1208, 1213 n.5 (11th Cir. 1995). *See also Littleton*, 569 B.R. at 206 (finding no actual fraud under 11 U.S.C. § 548(a) when a plaintiff/trustee could only illustrate four of the eleven badges of fraud and declining "to speculate what may have been proven if" the trustee provided more evidence).

Ultimately, because Mr. Maples's lack of evidence fails to create a genuine issue of material fact, the court will GRANT Defendants' motion for summary judgment regarding Mr. Maples's actual fraud claims pursuant to 11 U.S.C. § 548 and AUFTA. (John Klein Count V; Harold Jeffreys Count V; Ben Jeffreys Count IV.) The court addresses the second half of Mr. Maples's federal fraud claims under § 548—constructive fraud[5]—against the three Defendants below. (John Klein Count II; Harold Jeffreys Count I; Ben Jeffreys Count I.)

**Constructive Fraud under 11 U.S.C. § 548(a)(1)(B)**

In addition to allegations of actual fraud, Mr. Maples contends that all three Defendants engaged in constructive fraud, pursuant to 11 U.S.C. § 548(a)(1)(B). Under this statute, a trustee may demonstrate constructive fraud and avoid transfers pursuant to any of four pathways:

> **(a)(1)** The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in

---

[5] Mr. Maples does not appear to allege constructive fraud pursuant to Ala. Code § 8-9A-4. *See* Doc. 7-6 at 7, H. Jeffreys Doc. 21 at 10, and B. Jeffreys Doc. 5 at 7 (referring exclusively to § 8-9A-4(a), the actual fraud cause of action.)

property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily . . .

**(B)(i)** received less than a reasonably equivalent value in exchange for such transfer or obligation; and

> **(ii)(I)** was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;
>
> **(II)** was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;
>
> **(III)** intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or
>
> **(IV)** made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

11 U.S.C. § 548(a)(1). In this case, Mr. Maples alleges that Defendants engaged in constructive fraud pursuant to both the first and fourth pathways. The court addresses each below.

*The First Pathway: Insolvency*

Under the first pathway, a trustee who brings a fraudulent transfer claim bears the burden of demonstrating that (1) the debtor had an interest in property; (2) the transfer of that interest occurred within two years preceding the bankruptcy petition; (3) the debtor was insolvent at the time of the transfer or became insolvent as a result of it; and (4) the debtor received less than reasonably equivalent value in exchange for the transfer. *In re XYZ Options, Inc.,* 154 F.3d at 1275.

Simply put, Mr. Maples must show that Priceville was insolvent when it received less than a reasonably equivalent value in exchange for Defendants' allegedly fraudulent transfers. But, as already discussed regarding preferential payments under U.S.C. § 547, Mr. Maples has made no evidentiary showing that Priceville was insolvent when the allegedly fraudulent transfers took place. His brief simply alleges, based on statements that appeared in complaints in

Alabama State cases, that because Priceville was "looted by a scam, leaving precious little to pay investor creditors," then Priceville was necessarily insolvent. (Doc. 27 at 17–19.) But mere allegations in complaints are not evidence, *Wright v. Farouk Sys.*, 701 F.3d 907, 911 n.8 (11th Cir. 2012), and even "precious little" is something; insolvency requires either nothing or less than nothing. 11 U.S.C. § 101(32).

Conversely, Defendants' expert J. Wray Pearce testified that he had not seen any evidence to support Mr. Maples's claim that Priceville was insolvent during the relevant time period. (Doc. 25-5 at 18–24.) Without any evidence to show that Priceville was insolvent, Mr. Maples cannot support a fraudulent transfer claim under the first pathway, 11 U.S.C. § 548(a)(1)(B)(ii)(I).

*The Fourth Pathway: Ordinary Course of Business*

Alternatively, Mr. Maples argues that Priceville should avoid the allegedly fraudulent transfers under subsection (a)(1)(B)(ii)(IV), which holds that the debtor may avoid a transfer if it "[1] received less than a reasonably equivalent value in exchange for such transfer or obligation . . . and [2] made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, [3] under an employment contract and [4] not in the ordinary course of business." 11 U.S.C. § 548 (emphasis added).

Defendants do not contest the second or third elements of this constructive fraud pathway; they instead argue that Priceville received an equivalent value in exchange for its transfers and that the transfers occurred in the ordinary course of business.[6] (Doc. 25-1 at 18–23.)

---

[6] Defendants' reply brief also argues *for the first time* that no employment contract existed. (Doc. 35 at 3.) But because this argument did not accompany Defendants' motion for summary judgment, and Mr. Maples had no opportunity to respond to it, the court will not consider

According to the bankruptcy statute, value means "property, or satisfaction or securing of a present or antecedent debt of the debtor." § 548(d)(2)(A). "The burden of proving lack of 'reasonably equivalent value' under 11 U.S.C. § 548(a)(2)(A) rests on the trustee challenging the transfer," *Nordberg v. Arab Banking Corp.*, 904 F.2d 588, 593–94 (11th Cir. 1990), and courts "generally construe the term 'value' broadly for purposes of the Bankruptcy Code." *PSN Liquidating Trust. v. Intelsat Corp.*, 615 F. App'x 925, 930 (11th Cir. 2015). The rendition of a service may even constitute value under this section. *Orlick v. Kozyak*, 309 F.3d 1325, 1332–33 (11th Cir. 2002). Additionally, in the § 548 context, transfers that occur in the "ordinary course of business" are "recurring, customary credit transactions that are incurred and paid in the ordinary course of business of the debtor and the debtor's transferee." 5 COLLIER ON BANKRUPTCY 548.05 (16th ed. 2019).

To show that Priceville received less than equivalent value in exchange for transfers that occurred outside the ordinary course of business, Mr. Maples produced photocopies of 55 checks related to Priceville's business and a list of vehicles that he alleges Defendants fraudulently transferred. (Doc. 27-3 at 60–75.) Mr. Maples also included with his complaints—but did not mention in his brief—a list of 19 checks made out from Priceville to John Klein between 2014 and early 2016, as well as a list of debit payments from Priceville II that went toward gas stations, restaurants, and similar organizations. (Doc. 7-6 at 11–19.)

Unfortunately, Mr. Maples has not provided context for or explained the significance of *any* of these transactions. He simply inserted these lists and scans among thousands of pages of

---

Defendants' contention that no employment contract existed. *See Atl. Specialty Ins. Co. A.S. v. Digit Dirt Worx, Inc*., No. 19-11887, 2019 U.S. App. LEXIS 33013, at *13 (11th Cir. Nov. 5, 2019) (holding that if a moving party presents new information in a reply brief, the court should either ignore the new argument or permit the non-moving party to file a sur-reply.)

other documents, such as extensive deposition transcripts and complaints from other cases, leaving the court uncertain about the transactions' relevance to the claims. The photocopies of the 55 checks are especially puzzling. The series of images shows that each check came from a Priceville account and went toward a variety of payees, such as Harold Jeffreys, auto parts stores, and other Priceville investors, between March and September of 2015. (Doc. 27-3.) But the parties' lack of discussion about these checks leaves the court with many questions. Why, for example, does this list apparently include only a small fraction of the total number of checks drawn from the Priceville account between March and September of 2015? Who curated this list, and what were the criteria for inclusion? What did these checks actually pay for? Why does Mr. Steenson—the purported signer of most of the checks—appear to use at least three vastly different signature styles?

The court has similar questions and concerns about the other lists and scans Mr. Maples has provided. In his amended complaint against John and Katie Klein, for example, Mr. Maples included a list of 19 checks made out to John Klein and a list of payments to gas stations and restaurants. (Doc. 7-6 at 2, 11–19.) But as far as the court can tell, Mr. Maples never specifically alludes to these documents again, which minimizes their usefulness to the court. *See Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir.) ("[G]rounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.").

Without expressly linking any transactions noted in his exhibits to Defendants' potentially fraudulent activity, Mr. Maples simply asserts the following set of allegations and legal conclusions in his brief opposing summary judgment:

> There is a genuine issue of material fact as to whether the transfer of vehicles, tractors, parts, implements, and cash, with no exchange of value, was outside the ordinary course of Priceville's business of selling and financing vehicles. Further, examination of the transactions leads to the conclusion that it is fair to infer that

payments to the Defendants were not made in the ordinary course of business—
round numbers, not salary, not commissions—and there was no agreement setting
out a commission relationship.

(Doc. 27 at 17, 19.) But without any nexus between the lists that Mr. Maples provides and the accompanying allegations, the court is reluctant to find a genuine issue of material fact exists that the listed transactions occurred without the exchange of value and outside the ordinary course of business.

Defendants, on the other hand, produced evidence in the form of CPA J. Wray Pearce's report, which states that around the same time as many of the allegedly fraudulent transfers, Defendants deposited roughly equivalent amounts of money back into accounts controlled by Priceville. (Doc. 25-5 at 10–25.) This evidence suggests that Priceville received an equivalent value in exchange for its transfers. Furthermore, John Klein and Ben Jeffreys also testified that all payments they received were for either for salary or otherwise occurred within the ordinary course of business. (Doc. 25-9 at 10; Doc 25-10 at 7.)

But the court also notes that Mr. Maples's statement of facts at the beginning of his brief but outside the context of his § 548 arguments includes references to Mr. Steenson's deposition regarding other types of smaller transactions associated with Defendants, such as meal tickets, bar tabs, gasoline purchases, child-support payments, and personal-vehicle parts. (Doc. 27 at 12; Doc. 27-2 at 109–110). Mr. Steenson testifies that Defendants purchased these items or services for themselves using Priceville credit cards or with Priceville funds. *Id.*

These types of self-serving, gratuitous transfers appear to fall outside the ambit of the statutory definition of value, and the parties disagree about whether the transfers occurred

outside Priceville's ordinary course of business.[7] *See In re Treadwell*, 699 F.2d 1050, 1051 (11th Cir. 1983) ("The object of section 548 is to prevent the debtor from depleting the resources available to creditors through gratuitous transfers of the debtor's property"); *Alexander v. DeLong, Caldwell, Novotny, & Bridgers,* LLC, 358 B.R. 429, 435 (Bankr. M.D. Ala. 2006) (holding in a similar context that determining whether a transaction occurs in the ordinary course of business "generally . . . is not suitable for determination by summary judgment" because what, exactly, constitutes a debtor's ordinary course of business is often a fact-specific inquiry.)

Defendants argue that because Mr. Steenson is incarcerated and faces "numerous charges of crimes of deception and dishonesty," that the court should not rely on his "self-serving" testimony. (Doc. 35 at 2.) But when ruling on a motion for summary judgment, district courts are not permitted to make credibility determinations; weighing evidence is the province of the jury. *See Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013) (holding that at the motion for summary judgment stage, "the law allows that interest and truth may go together") (citation omitted).

In this case, because the parties have presented contradictory evidence regarding both the value of certain alleged transactions and whether these transactions occurred in the ordinary course of Priceville's business, a genuine issue of material fact exists concerning Mr. Maples's constructive fraud claims. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). The court will DENY Defendants' motion for summary judgment regarding constructive fraud under 11 U.S.C. § 548. (John Klein Count II; Harold Jeffreys Count I; Ben Jeffreys Count I.)

---

[7] Because Mr. Maples's brief includes so few evidentiary references in its analysis section, the court cannot determine if any overlap exists between the types of transfers Mr. Steenson described in his deposition and the items appearing on the list of vehicles or purchased with any of the 55 checks. Regardless, Mr. Steenson's deposition, standing alone, creates a genuine issue of material fact regarding Defendants' alleged constructive fraud under § 548.

### c.  **Equitable Subordination (Harold Jeffreys)**

Mr. Maples alleges that Harold Jeffreys engaged in unethical conduct by "operating the undercapitalized . . . Debtor, breaching his fiduciary duties, facilitating fraudulent transfers and making preferential transfers." (H. Jeffreys Doc. 21 at 8.) Mr. Maples brings his equitable subordination claim pursuant to 11 U.S.C. § 510(c), which provides that

> after notice and a hearing, the court may (1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or (2) order that any lien securing such a subordinated claim be transferred to the estate.

11 U.S.C. § 510(c). Although Mr. Maples does not specify which—or how many—of Harold Jeffreys's bankruptcy court claims should be subordinated, Defendants' motion for summary judgment refers to what appears to be an aggregate $3.4 million claim that Harold Jeffreys has lodged against the debtor's estate. (Doc. 25-1 at 26.) The court assumes that Mr. Maples's equitable subordination claim refers generally to this $3.4 million amount.

The Eleventh Circuit explained that 11 U.S.C. § 510(c) "adopts the long-standing judicially developed doctrine of equitable subordination under which a bankruptcy court has power to subordinate claims against the debtor's estate to claims it finds ethically superior under the circumstances." *In re Lemco Gypsum, Inc.*, 911 F.2d 1553, 1556 (11th Cir. 1990).

Courts may exercise equitable subordination power under this statute "only where three elements are established: (1) The claimant must have engaged in some type of inequitable conduct[;] (2) The misconduct must have resulted in injury to the creditors or conferred an unfair advantage on the claimant; (3) Subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Act." *Id.* (citing *In re Mobile Steel*, 563 F.2d 692, 700 (5th Cir. 1977)).

Regarding the first element, the burden and sufficiency of proof required to show inequitable conduct varies, depending upon whether the claimant is an insider. *In re N & D Props., Inc.*, 799 F.2d 726, 731 (11th Cir. 1986). Insiders' claims are subordinated more readily than those of entities that dealt with the debtor at arms' length. *In re Mobile Steel Co.*, 563 F.2d at 701. If the claimant is an insider, the trustee bears the burden of producing "material evidence of unfair conduct" (whereas if the claimant is *not* an insider, the trustee must prove "egregious conduct . . . with particularity"). *In re N & D Props., Inc.*, 799 F.2d at 731. If the trustee provides such evidence, the "insider-claimant can rescue its claims from subordination only by proving the good faith and fairness of its dealings with the debtor." *Lemco Gypsum,* 911 F.2d at 1557.

Although Mr. Maples has established that Harold Jeffreys was a Priceville insider, he must also produce material evidence that Harold Jeffreys engaged in inequitable conduct. *See* 11 U.S.C. § 101(31)(B) (defining corporate insiders to include general partners, officers, directors, or anyone "in control" of the debtor). "Inequitable conduct is conduct which may be lawful, yet shocks one's good conscience[;] a secret or open fraud[;] an unjust enrichment, not by astuteness or business acumen, but enrichment through another's loss brought about by one's own unconscionable, unjust, unfair, close or double-dealing or foul conduct." *In re Eddy*, 572 B.R. 774, 782 (Bankr. M.D. Fla. 2017) (quoting *In re Harvest Milling Co.*, 221 F. Supp. 836, 838 (D. Or. 1963)). In this case, Mr. Maples has provided no material evidence that Harold Jeffreys engaged in any of these types of behaviors.

Mr. Maples's complaint alleges that Harold Jeffreys "engaged in inequitable conduct by, among other things, operating the undercapitalized . . . Debtor, breaching his fiduciary duties, facilitating fraudulent transfers, and making preferential transfers." (H. Jeffreys Doc. 21 at 8.) But in his brief opposing Defendants' motion for summary judgment, the only evidence Mr.

Maples provides to support his equitable subordination claim comes from the depositions of several Priceville co-investors:

1. Harold Jeffreys is a well-educated, sophisticated businessman. (Doc. 27 at 22–23.)

2. He knew about Mr. Steenson's criminal history, yet he took Mr. Steenson on as a business partner anyway because he thought Mr. Steenson had changed his ways. (*Id.* at 24.)

3. Mr. Steenson borrowed money from Harold Jeffreys and never paid it back. (*Id.* at 26.)

4. Harold Jeffreys solicited friends and family to co-invest in Priceville with him, but he did not tell them about Mr. Steenson's checkered past. (*Id.* at 24–25.)

5. Harold Jeffreys "conducted meetings" on behalf of Priceville, "had access to the company's bank accounts," and "had signatory authority on the business account." (Doc. 27 at 22, 25.)

6. Priceville's books would have likely shown discrepancies of which a reasonable person should have been aware. (*Id.* at 26.)

Based on these facts, Mr. Maples argues that Harold Jeffreys "had the duty to exercise diligence with regard to the business information he was given" and "should have investigated the red flags flying up all around the business." *Id.* at 26. Ultimately, Mr. Maples argues that Harold Jeffreys "deserves to be liable for the debts of most and to have his own debt subordinated." *Id.*

Harold Jeffreys expressly denies only one of these allegations—that he solicited co-investors for Priceville.[8] (Doc. 27-10 at 28.) But assuming each of these allegations is correct, and drawing all reasonable inferences in favor of Mr. Maples, which the court must do at this procedural stage, the statements from the co-investors' depositions merely suggest that Harold Jeffreys was (1) a possibly negligent businessman and (2) an insider, because he exercised control over Priceville. At bottom, Mr. Maples's evidence does not reasonably demonstrate that Harold Jeffreys engaged in unconscionable, unjust, or foul behavior. *See In re Eddy*, 572 B.R. at 782.

Because Mr. Maples has not met the first element of equitable subordination—that of providing material evidence of Harold Jeffreys's inequitable conduct—the court will GRANT Harold Jeffreys's motion for summary judgment regarding Mr. Maples's 11 U.S.C. § 510(c) claim. (Harold Jeffreys Count III.)

### d. Post-Petition Transfers (Harold Jeffreys)

Mr. Maples alleges that Harold Jeffreys engaged in post-petition transfers in violation of 11 U.S.C. § 549. (H. Jeffreys Doc. 21 at 9–10.) Specifically, Mr. Maples claims that Harold Jeffreys transferred 13 vehicles—worth a total of $24,500—to a creditor salvage business after Priceville filed the bankruptcy petition. (*Id.*)

Section 549 permits a trustee to avoid the transfer of estate property if the trustee can demonstrate: (1) a post-petition transfer (2) of estate property (3) which was not authorized by the Bankruptcy Code or the court. 11 U.S.C. § 549(a). "[T]o the extent that a transfer is avoided

---

[8] The court notes that Mr. Maples alleges in his response brief that Harold Jeffreys, while deposed in another case, "testified under oath . . . that he was aware of and did, in fact, solicit investments from his relatives." But a plain reading of the alluded-to deposition belies Mr. Maples's contention. When asked if he solicited investments from his relatives, Harold Jeffreys replied, "They weren't solicited by me." (Doc. 27-10 at 28.)

under section . . . 549 . . . the trustee may recover, for the benefit of the estate, the property transferred, or if the court so orders, the value of such property, from the initial transferee of such transfer." 11 U.S.C. § 550(a).

In Defendants' motion for summary judgment, Harold Jeffreys does not deny that he transferred the vehicles post-petition. He instead provides three ostensible defenses for the transfers that, he contends, justify granting him summary judgment regarding Mr. Maples's post-petition transfers claim. First, Harold Jeffreys transferred the titles to the salvage dealer after consulting with the debtor-estate's attorney, so Harold Jeffreys was "trying to do the right thing." (Doc. 25-1 at 27.) Second, Harold Jeffreys transferred the titles pursuant to a mechanics' lien asserted by the salvage business against the vehicles for non-payment. *Id.* Third, Mr. Maples eventually recovered the vehicles, which apparently sold at auction about two years later for between $4,000 and $6,000. *Id.*

All three defenses fail. Absent court authorization (which is not alleged here), section 549 recognizes only two exceptions to a trustee's avoiding power: first, subsection (b), which applies only to involuntary bankruptcy cases and, second, subsection (c), which protects *bona fide* purchasers of real property. *Marathon Petroleum Co., LLC v. Cohen*, 599 F.3d 1255, 1262. Because the instant case involves a voluntary bankruptcy and the transfer of vehicular titles rather than real property, neither exception applies. *See id.* (reiterating Section 549's two-exception paradigm and holding that "a 'harmless' exception to a trustee's Section 549(a) avoiding powers does not exist.")

Mr. Maples acknowledges that because Priceville eventually recovered the vehicles, any further recovery pursuant to this claim would be minimal. (Doc. 27 at 27.) But because Harold Jeffreys has raised no cognizable defense to this claim and because a genuine issue of material

fact exists regarding the value of the vehicles—and any diminution in value that occurred while the salvage dealership possessed the vehicles—the court will DENY Harold Jeffreys's motion for summary judgment regarding Mr. Maples's post-petition transfers claim. (Harold Jeffreys Count IV.)

### e. Breach of Good Faith and Fair Dealing (Harold Jeffreys)

Mr. Maples alleges that Harold Jeffreys breached his duty of good faith and fair dealing because, as a member of Priceville, Harold Jeffreys "ignor[ed] fraudulent financial reports, ma[de] unlawful transfers, and grossly mismanage[ed] the business of the Debtor." (H. Jeffreys Doc. 21 at 11.)

In Alabama, an implicit duty of good faith and fair dealing attaches to the parties of every contract. *Shoney's LLC v. MAC EAST, LLC*, 27 So. 3d 1216, 1220 n.5 (Ala. 2009); *World's Exposition Shows v. B.P.O. Elks No. 148*, 186 So. 721, 723 (Ala. 1939). But unless a plaintiff can first show a specific contractual breach, a good faith and fair dealing claim cannot stand. *Lake Martin/Alabama Power Licensee Association, Inc. v. Alabama Power Co*., 601 So. 2d 942, 944 (Ala. 1992). Because Mr. Maples does not allege, much less show, that Harold Jeffreys breached any particular provision of a contract, the good faith and fair dealing claim fails as a matter of law. The court will GRANT Harold Jeffreys's motion for summary judgment regarding Mr. Maples's good faith and fair dealing claim. (Harold Jeffreys Count VI.)

### f. Breach of Fiduciary Duty (Harold Jeffreys)

Mr. Maples alleges that because Harold Jeffreys failed to manage Priceville in a responsible manner, facilitated insider deals, and fraudulently transferred $700,000 in assets—in both cash withdrawals and at least ten different vehicles—to himself and his relatives, Harold Jeffreys breached his fiduciary duty to Priceville. (H. Jeffreys Doc. 21 at 5–6, 11–12.)

A corporate fiduciary owes two duties: care and loyalty. *Massey v. Disc Mfg., Inc.*, 601 So. 2d 449, 456 (Ala. 1992). The duty of care requires fiduciaries to behave as would "ordinarily prudent and diligent men . . . under similar circumstances." *Id.* (quoting *Briggs v. Spaulding*, 141 U.S. 132, 152 (1891)). A "breach of the duty of care is essentially a negligence cause of action." *Davis v. Dorsey*, 495 F. Supp. 2d 1162, 1170 (M.D. Ala. 2007) (citing Richard A. Thigpen, *Alabama Corporation Law* § 10:12 (3d ed. 2003)). On the other hand, the duty of loyalty prohibits faithlessness and self-dealing. Simply put, the duty of loyalty prevents corporate fiduciaries from using their corporate positions for personal gain. *Id.*

In response to Mr. Maples's breach of fiduciary duty allegations, Harold Jeffreys presents three arguments in favor of summary judgment. First, Mr. Maples's pleading is facially deficient; second, the evidence shows that Mr. Steenson caused Priceville's downfall, not Harold Jeffreys; and third, the claim is time-barred under Alabama's statute of limitations. (Doc. 25-1 at 29.) All three contentions lack merit.

Regarding Harold Jeffreys's first argument, that the breach of fiduciary duty claim is insufficiently pled, the court first notes that the relevant question at this procedural stage is what may be shown via evidence, as demonstrated in a brief opposing summary judgment, not what appears in a complaint. *Celotex*, 477 U.S. at 324. Regardless, the court agrees that Mr. Maples's *brief* is short on relevant, factual evidence. Meager though it may be, however, the brief does raise genuine issues of material fact regarding Harold Jeffreys's possible negligent and self-dealing behavior. A reasonable jury could conclude that Harold Jeffreys behaved negligently by partnering with a convicted felon and then failing to notice allegedly repeated and obvious balance sheet discrepancies. *See* Doc. 27 at 22–26, (citing to Harold Jeffreys's deposition, in

which he appears to admit that he likely would have noticed a conspicuous lack of deposits had he actually looked at the accounts.)

A jury could also conclude that Harold Jeffreys used his position as majority shareholder to act in his own self-interest. Mr. Maples's brief references the testimony of Mr. Steenson, who asserts that Harold Jeffreys may have purchased gasoline with a Priceville credit card, knew his son-in-law used company credit cards to purchase parts for his personal vehicles, and maintained "side deals" that allowed Harold Jeffreys to get paid back more quickly than other Priceville investors. (Doc. 27 at 8, 12, 13; Doc. 27-2 at 109.)

Harold Jeffreys's second argument, that Mr. Maples's breach of fiduciary duty claim should be dismissed because Mr. Steenson was the primary culprit in the Priceville saga, lacks facial plausibility. Merely because one person commits wrongdoing does not preclude the possibility that a second person can also do wrong. Based on the evidence Mr. Maples provides, a fact question exists over Harold Jeffreys's fiduciary duties, regardless of Mr. Steenson's culpability in Priceville's demise.

Third, although Alabama's statute of limitations for breach of fiduciary duty claims is two years from the date a cause of action accrues, *see Hensley v. Poole*, 910 So. 2d 96, 101 (Ala. 2005) (citing Ala. Code § 6-2-38(l)), federal law provides that a trustee of a bankrupt entity may bring a claim either within the ordinary state-governed statutory period *or* within two years from the bankruptcy court's entry of the order of relief. 11 U.S.C. § 108(a); *Beck v. Deloitte & Touche*, 144 F.3d 732, 736 (11th Cir. 1998). *See also Lovett v. Ray*, 327 F.3d 1181, 1182 (11th Cir. 2003) ("Federal law determines when the statute of limitations begins to run.").

Here, the order for relief occurred on March 4, 2016, the date that Priceville filed a petition of bankruptcy. (Bankruptcy Doc. 1). *See also* 11 U.S.C. § 301(b) ("The commencement

of a voluntary case under a chapter of this title constitutes an order for relief under such chapter.") Mr. Maples filed the instant proceedings on February 17, 2018. (Bankr. Docs. 446–448.) Because Mr. Maples filed adversary proceedings against Harold Jeffreys fewer than two years after the order for relief, Harold Jeffreys's statute of limitations argument fails.

Because Mr. Maples brought the instant claim against Harold Jeffreys within the statutorily permissible period and has demonstrated the presence of genuine issues of material fact concerning Harold Jeffreys's alleged breach of the duties of care and loyalty, the court will DENY Harold Jeffreys's motion for summary judgment regarding Mr. Maples's breach of fiduciary duty claim. (Harold Jeffreys Count VII.)

### g. Alter Ego (John Klein)

Mr. Maples contends that John Klein comingled assets between Priceville and Priceville II and used Priceville II to evade claims of Priceville's creditors. (Doc. 7-6 at 9.) Based on these claims, Mr. Maples asks the court to find that Priceville II was the alter ego of Priceville and pierce the corporate veil to hold John Klein liable to Priceville's creditors. (Doc 7-6 at 9.) The instant motion asks the court to grant summary judgment on this claim because Mr. Maples has failed to provide sufficient evidence for—or even allege—the required elements of the claim. The court agrees with John Klein.

According to the complaint, John Klein, Harold Jeffreys, Ben Jeffreys, and Mr. Steenson organized Priceville II on June 13, 2014, and John Klein held 40 percent interest as the managing member. (Doc. 7-6 at 3.) Aside from these facts regarding Priceville II's founding, the complaint's entire treatment of the count reads as follows: "John [Klein] organized and managed PP2 to further carry out the fraudulent business of the debtor. As managing member, John

commingled assets of the Debtor and PP2. John has used PP2 to evade claims of creditors. John is liable to creditors for diverting funds of the Debtor and PP2 for his personal use." (*Id.* at 9.)

Mr. Maples's one-paragraph treatment of the issue in his response brief is hardly any more illuminating. The brief cites to statements in John Klein's deposition to suggest that (1) John Klein was the only employee of Priceville II; (2) John Klein's compensation as manager of Priceville II came from Priceville; and (3) money routinely flowed from Priceville to Priceville II, but not the other way around. (Doc. 27 at 30.) Mr. Maples then asks the court to pierce Priceville II's corporate veil to hold John Klein personally liable to Priceville's creditors. But this argument runs into several problems.

First, Priceville II is not a party to this action. *See SM Energy Co. v. Smackco Operating, LLC*, No. 13-0594-KD-B, 2014 U.S. Dist. LEXIS 73116, at *24–25 (S.D. Ala. May 29, 2014) (holding that a corporation whose veil a plaintiff wishes to pierce is a necessary party in a suit.) *See also Gulf States Steel, Inc. v. Lipton*, 765 F. Supp. 696, 703 n.6, n.7 (N.D. Ala. 1990) (declining to pierce a corporate veil for several reasons, including the fact that "the corporation whose veil [the plaintiff] is attempting to pierce has not been named a party to this action.")

Furthermore, Mr. Maples does not expressly tether his putative "alter ego count" to any substantive claim. In Alabama, a "claim based on the alter ego theory is not in itself a claim for substantive relief, but rather is procedural. A finding of fact of alter ego, standing alone, creates no cause of action. It merely furnishes a means for a complainant to reach a second corporation or individual." *Ryals v. Lathan Co.*, 77 So. 3d 1175, 1179 (Ala. 2011) (internal quotation omitted). Determining whether the corporate veil should be pierced presents a matter of both fact and equity. *Ex parte AmSouth Bank of Alabama*, 669 So. 2d 154, 156 (Ala. 1995). *See also Woods v. Commercial Contractors, Inc.*, 384 So. 2d 1076, 1079 (Ala. 1980) (holding that

"[w]hether [an entity] was the alter ego of his numerous corporations is necessarily a question of fact"); *Mark Heisz & Aegis Strategic Inv. Corp. v. Galt Indus.*, 93 So. 3d 918, 929 (Ala. 2012) ("Whether the corporate veil of a business entity should be pierced is a matter of equity, properly decided by a judge after a jury has resolved the accompanying legal issues."). Here, Mr. Maples has failed to expressly tie his request for corporate veil-piercing to any specific cause of action.

But even beyond these deficiencies, Mr. Maples has not adequately alleged—much less provided sufficient evidence for the court to find—that Priceville II was the alter ego of Priceville. A plaintiff in Alabama who seeks to pierce a corporate veil under an alter ego theory must meet three elements. First, the dominant corporation must have completely controlled the alleged alter ego's "finances, policy and business practices so that at the time of the attacked transaction the subservient corporation had no separate mind, will, or existence of its own." *Messick v. Moring*, 514 So. 2d 892, 894 (Ala. 1987). Second, the dominant corporation "misused" the putative alter ego, as evaluated using equitable principles; and third, the misuse proximately caused the complained-of harm. *Id. See also Hill v. Fairfield Nursing & Rehab. Ctr., LLC*, 134 So. 3d 396, 412–415 (Ala. 2013) (Murdock, J., concurring) (acknowledging this three-part test and also referencing an overlapping and complementary 11-factor test that the Alabama Supreme Court has also used to determine a corporation's alter ego status.)

Regarding the first element, John Klein's deposition appears to show that he was the sole employee of Priceville II, was paid by Priceville, and that, in general, money flowed from Priceville to Priceville II. (Doc. 27 at 30; Doc. 35 at 10.) But these facts alone do not demonstrate Priceville's complete control over Priceville II, as required by the first element. Overlap in corporate ownership or occasional transfer of funds do not justify piercing a corporate veil, as "[p]iercing the corporate veil is not a power that is lightly exercised. . . . The mere fact

that a party owns all or a majority of the stock of a corporation does not, of itself, destroy the separate corporate identity." *Backus v. Watson*, 619 So. 2d 1342, 1345 (Ala. 1993) (internal citation omitted).

But even assuming Mr. Maples produced evidence that Priceville completely controlled Priceville II, "mere domination cannot be enough for piercing the corporate veil. There must be the added elements of misuse of control and harm or loss resulting from it." *Simmons v. Clark Equip. Credit Corp.*, 554 So. 2d 398, 400 (Ala. 1989). In this case, Mr. Maples's brief provides no evidence regarding either the second or third elements.

Because Mr. Maples failed to provide sufficient evidence to support a finding that Priceville II was the alter ego of Priceville, the court will GRANT John Klein's motion for summary judgment regarding Mr. Maples's alter ego claim. (John Klein Count VIII.)

## IV.    Conclusion

For the reasons explained above, the court will GRANT in part and DENY in part the three Defendants' motion for summary judgment. (Doc. 25.) The court will GRANT the motion regarding the following claims: against John Klein, preferential payments (Count III), state fraudulent transfers (Count V), and alter ego (Count VIII); against Harold Jeffreys, preferential payments (Count II), equitable subordination (Count III), state fraudulent transfers (Count V), and breach of good faith and fair dealing (Count VI); against Ben Jeffreys, preferential payments (Count II) and state fraudulent transfers (count IV). These claims will be DISMISSED with prejudice.

The court will DENY the Defendants' motion for summary judgment regarding Mr. Maples's federal fraudulent transfer claims (John Klein Count II, Harold Jeffreys Count I, Ben

Jeffreys Count I), as well as the post-petition transfers claim (Count IV) and breach of fiduciary duties claim (Count VII) against Harold Jeffreys.

Mr. Maples's remaining claims are as follows: against John Klein, federal fraudulent transfers (Count II); against Harold Jeffreys, federal fraudulent transfers (Count I), post-petition transfers (Count IV), and breach of fiduciary duties (Count VII); against Ben Jeffreys, federal fraudulent transfers (Count I).

The court will enter a separate order accompanying this opinion.

DONE and ORDERED this 27th day of March, 2020.

_____
**KARON OWEN BOWDRE**
UNITED STATES DISTRICT JUDGE